UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FRED HUMPHREY, et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. 1:15-cv-14170-ADB |
| | * | |
| JEFFREY COMOLETTI, et al., | * | |
| | * | |
| Defendants. | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

In this civil rights action, Fred Humphrey ("Humphrey"), Taneisha Humphrey, and J.B.,

a minor, ("Plaintiffs") allege that Humphrey was assaulted and injured by members of the Fall

River Police Department during the execution of a search warrant in a private home on

December 21, 2012. Before the Court are Defendant Jeffrey Comoletti's second motion to

dismiss for failure to state a claim [ECF No. 40], Defendants John Cabral and William Falandys'

motion to dismiss for failure to state a claim [ECF No. 42], and Defendant City of Fall River,

Massachusetts' motion to dismiss [ECF No. 45]. For the reasons set forth below, the Court

GRANTS in part and DENIES in part Comoletti's [ECF No. 40], Falandys' and Cabral's [ECF

No. 42], and the City of Fall River's [ECF No. 45] motions.

I.       **PROCEDURAL BACKGROUND**

Plaintiffs initiated this action on December 18, 2015 against Jeffrey Comoletti; William J.

Falandys; John Cabral; City of Fall River, Massachusetts; and John Does 1 through 7 (the

"Defendants"). [ECF No. 1]. All of the individual defendants who were members of the Fall

River Police Department are sued in both their individual and official capacities. The Defendants

filed several motions to dismiss. Shortly after opposing the motions, Plaintiffs moved to amend

1

the original complaint on June 30, 2016, [ECF No. 31]. On August 3, 2016, the Court allowed

Plaintiffs to amend their complaint, and denied without prejudice the then-pending motions to

dismiss as moot. [ECF No. 35]. On August 11, 2016, Plaintiffs filed an Amended Complaint

[ECF No. 37]. On August 25, 2016, Comoletti filed a motion to dismiss for failure to state a

claim. [ECF No. 40]. On September 2, 2016, Cabral and Falandys and the City of Fall River

separately filed motions to dismiss. [ECF Nos. 42, 45]. Plaintiffs opposed all three motions.

[ECF Nos. 47, 48, 53, 52].[1]

## II.      FACTS ALLEGED IN THE AMENDED COMPLAINT

Humphrey is a resident of Newport, Rhode Island. At the time of the incident, he resided

with his two minor daughters, Plaintiffs Taneisha Humphrey (who has now reached the age of

majority) and J.B. (who is still a minor). Taneisha and J.B. are residents of Connecticut.

On December 20, 2012, Humphrey and his business associate, Christopher Stephens, sold

a go-kart to Comoletti, which was the second go-kart that Comoletti had purchased from

Humphrey and Stephens. In exchange, Comoletti gave Humphrey and Stephens an unspecified

amount of cash, plus a tablet device. Soon thereafter, Humphrey and Stephens realized that the

tablet device was not worth what Comoletti had said it was. They contacted Comoletti, who

allegedly threatened both Humphrey and Stephens by stating, among other things, that members

of Comoletti's family were in the Fall River Police Department and that eight officers of the Fall

River Police Department would show up at Stephens' apartment at an unspecified time.

On December 21, 2012, Comoletti filed a complaint against Stephens with the Weymouth

Police Department. Specifically, Comoletti reported that Stephens was selling AK-47s and had a

large amount of marijuana at his apartment in Fall River. Plaintiffs allege that Comoletti knew

---

[1] Plaintiffs filed duplicative oppositions at ECF Nos. 47 and 48.

these statements were false at the time he made them. Plaintiffs further allege that Comoletti knew that Humphrey was not a resident of Fall River, Massachusetts but that he spent most days with Stephens. On the same day, a Weymouth police officer passed this information on to Falandys, a Detective in the Fall River Police Department. On the basis of the information from Comoletti, Falandys applied for and received a search warrant for Stephens' apartment.

Later that day, Falandys, Cabral (another detective in the Fall River Police Department), and seven unnamed Fall River Police Officers, whom Plaintiffs have named as John Doe Defendants (collectively, the "Officer Defendants"), executed the search warrant. At the time the search warrant was executed, both Stephens and Humphrey were inside Stephens' apartment. The officers ordered Humphrey to lie down on the ground during the search. Plaintiffs allege that as Humphrey was getting down on the floor, "at least one of" the Officer Defendants kicked him in the head several times, causing him to lose consciousness. None of the Officer Defendants intervened or helped Humphrey. They also failed to provide medical aid or call an ambulance. When Humphrey regained consciousness shortly afterwards, he asked why he had been kicked in the head. One of the Officer Defendants allegedly responded that "some people deserved to be kicked." The inventory, which Falandys signed in the presence of Cabral, reports "Nothing Found," including no "illegally possessed assault weapons, machine guns, firearms, shotguns, ammunition,[and] feeding devices," or "[a]ny paraphernalia, or instrumentalities, related to the use, sales, manufacture, defacement, and distribution, of said illegal weapons." [ECF No. 37-1 at 1]. Neither Humphrey nor Stephens were ever charged with resisting arrest or assaulting a police officer.

Plaintiffs assert that the Officer Defendants were acting under color of law during the relevant time period. Moreover, Plaintiffs claim that Falandys and other members of the Fall

River Police Department have previously assaulted citizens without just cause, which in at least

one instance in 2011 resulted in a citizen's death. The City of Fall River has settled prior cases

brought against Falandys and other officers in connection with these alleged assaults. Plaintiffs

also argue that the City of Fall River has failed to provide adequate training, supervision, and

discipline and that the Officer Defendants' actions when executing the search warrant were

undertaken pursuant to the City's and police department's "policy, practice and action." Compl.

¶¶ 51–52. Further, Plaintiffs allege that the City had a policy or custom of hiring offers with a

propensity for violence and abusing authority. Plaintiff, who is African-American, alleges that

the majority, if not all of the officers involved in the assault, were Caucasian.

## III.    CLAIMS FOR RELIEF

The Amended Complaint includes seven claims for relief. Count I alleges, pursuant to 42

U.S.C. § 1983, that the Officer Defendants violated Humphrey's rights under the Fourth and

Fourteenth Amendments by using unreasonable force against Humphrey while they executed the

search warrant at Stephens' apartment. Count II alleges that the Officer Defendants engaged in a

civil conspiracy to violate Humphrey's constitutional rights, in violation of 42 U.S.C. § 1985.

Count III asserts a § 1983 Monell[2] claim against the City of Fall River on the grounds

that "[i]t was the custom, policy, and/or practice of the City of Fall River to provide inadequate

training and/or supervision to its police officers" regarding "their duties, responsibilities and

conduct towards persons of color; use of force; and preventing abuse of authority," and that the

City has been "deliberately indifferent" in hiring, training, supervising, and disciplining officers

in this regard. Moreover, Plaintiffs allege that the City was aware of Falandys' propensity for

violence because of a prior incident in 2011 when an individual died during the execution of a

---

[2] See Monell v. Dep't of Social Servs., 436 U.S. 658 (1978).

search warrant. Count IV purports to assert a claim for "vicarious liability" against the City of Fall River because the Officer Defendants acted within the course and scope of their employment during the relevant time period.

Count V asserts claims against the Officer Defendants under Article 14 of the Massachusetts Declaration of Rights and the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I (the "MCRA").

Counts VI and VII pertain to Comoletti alone. Count VI alleges an abuse-of-process claim that is based on Comoletti's threats to Humphrey and Stephens, coupled with his knowing and intentional provision of false information to the Weymouth police. Count VII alleges a violation of the MCRA based on the same threats and acts of intimidation, and further that Comoletti knew the false information would be used by the Weymouth Police Department to obtain a search warrant of Stephens' residence in Fall River, Massachusetts. Plaintiffs allege that the threats and intimidation interfered with Humphrey's exercise and enjoyment of rights secured by the Massachusetts constitution and its laws.

Plaintiffs allege that, as a result of the above actions, Humphrey suffered severe physical injuries and emotional distress, and that his daughters suffered a loss of consortium with their father.[3] As relief, Plaintiffs seek a declaration that the City of Fall River violated Humphrey's Fourth and Fourteenth Amendment rights because of its customs, policies, and/or practices by failing to provide adequate training regarding the use of force on individuals that are not targets of search warrants and by being deliberately indifferent in training, supervising, and disciplining officers and supervisors regarding their duties, responsibilities, and conduct towards people of

---

[3] Although the Amended Complaint contains no separate loss-of-consortium claims, Plaintiffs allege that Taneisha and J.B. suffered from loss of consortium as a result of Humphrey's injuries in each of the counts.

color. Plaintiffs also seek compensatory and punitive damages, attorneys' fees, legal interest, and

costs.

## IV.    LEGAL STANDARD

On a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil

Procedure 12(b)(6) ("Rule 12(b)(6)"), the Court must accept as true all well-pleaded facts,

analyze those facts in the light most hospitable to the plaintiff's theory, and draw all reasonable

inferences from those facts in favor of the plaintiff. U.S. ex rel. Hutcheson v. Blackstone Med.

Inc., 647 F.3d 377, 383 (1st Cir. 2011). Aside from the complaint, "within the Rule

12(b)(6) framework, a court may consider matters of public record and facts susceptible to

judicial notice." U.S. ex rel. Winkelman v. CVS Caremark Corp., 827 F.3d 201, 208 (1st Cir.

2016).

Although detailed factual allegations are not required, a complaint must set forth "more

than labels and conclusions." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). A

"formulaic recitation of the elements of a cause of action" is not enough. Id. To avoid dismissal,

a complaint must set forth "factual allegations, either direct or inferential, respecting each

material element necessary to sustain recovery under some actionable legal theory." Gagliardi v.

Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (internal quotations and citation omitted).

Further, the facts alleged, when taken together, must be sufficient to "state a claim to

relief that is plausible on its face." A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80

(quoting Twombly 550 U.S. at 570). "The plausibility standard invites a two-step pavane." Id.

(quoting Grajales v. P.R. Ports Auth., 682 F.3d 40, 45 (1st Cir. 2012)). "At the first step, the

court 'must separate the complaint's factual allegations (which must be accepted as true) from its

conclusory legal allegations (which need not be credited).'" Id. (quoting Morales-Cruz v. Univ.

of P.R., 676 F.3d 220, 224 (1st Cir. 2012)). "At the second step, the court must determine whether the remaining factual content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Morales-Cruz, 676 F.3d at 224). "The make-or-break standard . . . is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief." Sepulveda-Villarini v. Dep't of Educ. of P.R., 628 F.3d 25, 29 (1st Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

## V.   COMOLETTI'S MOTION TO DISMISS

Comoletti argues that both counts alleged against him (Counts VI and VII) should be dismissed.

### a.   Special Motion to Dismiss Count VI (abuse of process)

In Count VI, Plaintiffs allege an abuse-of-process claim against Comoletti based on the threats he directed against Stephens and Humphrey and the allegedly false information he provided to the Weymouth Police Department with the intent that it be used to obtain a search warrant for Stephens' property. In his special motion to dismiss, Comoletti argues that the count must be dismissed because his actions are fully protected by the Massachusetts Strategic Litigation Against Public Participation ("Anti-SLAPP") statute, Mass. Gen. Laws ch. 231, § 59H. The Anti-SLAPP statute permits a party to bring a special motion to dismiss when the allegations against him "are based on said party's exercise of its right of petition under the constitution of the United States or of the commonwealth." Mass. Gen. Laws ch. 231, § 59H. The statute further provides that:

> The court shall grant such special motion, unless the party against whom such special motion is made shows that: (1) the moving party's exercise of its right to petition was devoid of any reasonable factual support or any arguable basis in law and (2) the moving party's acts caused actual injury to the responding party. In making its determination, the court shall consider the pleadings and

supporting and opposing affidavits stating the facts upon which the
liability or defense is based.

Id.

The Massachusetts Supreme Judicial Court has laid out a two-step procedure for such
special motions to dismiss. First, "the special movant must make a threshold showing through
pleadings and affidavits that the claims against it 'are based on the petitioning activities alone
and have no substantial basis other than or in addition to the petitioning activities.'" Fustolo v.
Hollander, 920 N.E.2d 837, 840 (Mass. 2010) (quoting Duracraft Corp. v. Holmes Prods. Corp.,
691 N.E.2d 935, 943 (Mass. 1998) (further internal quotations omitted)). Second, "the opposing
party must then show by a preponderance of evidence that the special movant's petitioning
activities 'lacked any reasonable factual support or any arguable basis in law.'" Id. (quoting
Baker v. Parsons, 750 N.E.2d 953, 961 (Mass. 2001)). "In this inquiry, courts consider pleadings
and affidavits without indulging inferences in favor of the non-moving party." Bargantine v.
Mechs. Co-op. Bank, No. 13-11132-NMG, 2013 WL 6211845, at *2 (D. Mass. Nov. 26, 2013).
When evaluating an abuse of process claim in the context of an Anti-SLAPP motion, as a
practical matter, the motion rises or falls on the first prong. This is because, where, as here, the
petitioning activity results in a search warrant or other legal process, it is generally not possible
to demonstrate that the petitioning activity was "devoid of any reasonable factual support or any
arguable basis in law." See Adams v. Whitman, 822 N.E.2d 727, 730 (Mass. 2005).

Under Massachusetts law, the common law tort of abuse of process requires proving the
following elements: that "(1) process was used; (2) for an ulterior or illegitimate purpose; (3)
resulting in damage." Gutierrez v. Mass. Bay Transp. Authy., 772 N.E.2d 552, 563 (Mass. 2002)
(quoting Datacomm Interface, Inc. v. Computerworld, Inc., 489 N.E.2d 185, 195 (Mass. 1986)).
"The tort has been described as usually involving a 'form of coercion to obtain a collateral

8

advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money.'" Keystone Freight Corp. v. Bartlett Consol., Inc., 930 N.E.2d 744, 751 (Mass. App. Ct. 2010) (quoting Vittands v. Sudduth, 730 N.E.2d 325, 332 (Mass. App. Ct. 2000)); see also Adams, 822 N.E.2d at 730 ("The tort has been described as usually involving a form of coercion to obtain collateral advantage not properly involved in the proceeding itself, similar to extortion."). "[I]t is immaterial that the process was properly issued, that it was obtained in the course of proceedings which were brought with probable cause and for a proper purpose or even that the proceedings terminated in favor of the person instituting or initiating them." Gutierrez, 772 N.E.2d at 563 (quoting Quaranto v. Silverman, 187 N.E.2d 859, 861 (Mass. 1963)); see also Keystone Freight Corp., 930 N.E.2d at 751 ("While the process may have been properly obtained, its misuse constitutes the conduct that is the basis of the tort for which liability is imposed."). Thus, the gravamen of an abuse of process claim is whether the defendant had an ulterior motive.

Although there is some inconsistency in the case law, it seems clear that there are instances where obtaining the process is in and of itself sufficient to achieve the illegitimate purpose required to establish an abuse of process claim. See Adams, 822 N.E.2d at 731–32 ("Without turning on any additional act of misuse, a number of cases find that initiating process alone can at times be so coercive and promoting of ulterior advantage that it supports an abuse of process claim."); see also Carroll v. Gillespie, 436 N.E.2d 431, 439 (Mass. App. Ct. 1982) (holding that "evidence was sufficient to support findings that [defendant] initiated the complaints with knowledge that they were groundless, that he sought to use the criminal process to collect a civil debt, and that he did so in spite of Officer Gerard's explicit warning that this was not its proper purpose." (internal citations omitted)). In such an instance, requiring

9

additional conduct beyond the misuse of the process to defeat an Anti-SLAPP motion could effectively insulate the abuse of process claim and preclude redress. Furthermore, "[t]he Supreme Judicial Court has applied a constitutional construction to § 59H in a manner that will not 'alter[ ] procedural and substantive law in a sweeping way.'" Keystone Freight Corp., 930 N.E.2d at 750 (alteration in original) (quoting Duracraft Corp., 691 N.E.2d at 942). Thus, this Court finds that under appropriate circumstances and to avoid protecting sham police reports and the like from suit, the initiation of process, without more, can be sufficiently coercive and calculated to promote an ulterior advantage to support an abuse of process claim and survive an Anti-SLAPP motion. See Adams, 822 N.E.2d at 732. This approach properly focuses the inquiry on the ulterior motive behind the seeking of the challenged process and avoids a view of the Anti-SLAPP statute that would wholly insulate sub-categories of bad behavior from the reach of tort law. See id. at 731, n.8 & n.9; see also Keystone Freight Corp., 930 N.E.2d at 751 ("We must interpret and apply the anti-SLAPP statute and our case law in such a way as to continue to permit, where appropriate and consistent with the intent of § 59H, claims of abuse of process as delineated by the Massachusetts common law.").

Consistent with this reasoning, "Massachusetts courts have denied special motions to dismiss abuse of process and malicious prosecution claims under § 59H when, although the conduct complained of was petitioning activity, additional evidence existed that 'independently demonstrated [the movant's] ulterior motive.'" Bargantine, 2013 WL 6211845, at *4 (alteration in original) (quoting Keystone Freight Corp., 930 N.E.2d at 752). "[E]vidence of improper action, separate and distinct from the exercise of petitioning activity, is necessary" to survive an Anti-SLAPP motion, but "attribution of a motive, alone, is never sufficient." Keystone Freight Corp., 930 N.E.2d at 752. Accordingly, consistent with Adams and Keystone, when there are

factual allegations and evidence that, independent of the process itself, support a finding that the defendant did in fact have an ulterior motive in initiating the process, a special motion to dismiss should be denied under the first prong. In the Court's view, this approach respects the intent behind the Anti-SLAPP statute while avoiding an application of that statute that could shield viable abuse of process claims (those in which the initiation of process itself is sufficiently coercive to constitute an abuse of process tort).

Here, there is evidence, independent of the petitioning activity, that establishes that Comoletti had an ulterior motive in making a report to the police. Plaintiffs have alleged that Comoletti got into a disagreement with Humphrey and Stephens regarding the go-kart transaction. In the context of a confrontation about the situation, he threatened Humphrey and Stephens, telling them that he knew police officers and would have them show up at Stephens' apartment. Consistent with this threat, he did in fact make a report to the police, which resulted in officers searching Stephens' residence and ultimately led to Humphrey's injuries. Furthermore, the fact that the searching officers found no illegal drugs or guns in Stephens' apartment supports the contention that the information on which the warrant was based was false information and that Comoletti's motive was to intimidate and coerce Stephens and Humphrey in connection with the go-kart transaction. This conclusion further is bolstered by the discrepancies among the various versions in the record of what Comoletti allegedly observed (the search warrant [ECF No. 47-1], a letter from Comoletti's attorney to Humphrey in connection with the instant action [ECF No. 47-5], and the affidavit attached to his motion to dismiss [ECF No. 41-1]), and which further undermine his ability to make the requisite threshold showing required by the first prong of the Anti-SLAPP special motion analysis. Thus, Comoletti's special motion to dismiss fails because he is unable to show that the Plaintiffs' abuse of process claim has no

substantial basis other than or in addition to his making a report to the police. Accordingly, the special motion to dismiss is denied.[4]

### b. Count VII: the MCRA claim

In Count VII, Plaintiffs allege an MCRA violation against Comoletti. Specifically, Plaintiffs allege that Comoletti threatened Humphrey and knew that the false information he provided to the Weymouth Police Department would be used to search Stephens' residence. Comoletti argues in his motion to dismiss that Plaintiffs have not adequately alleged that Comoletti threatened Humphrey in order to coerce him to give up his Fourth Amendment right to be free from unreasonable searches and seizures. In their opposition, however, Plaintiffs claim that they never intended to make this allegation, but instead allege that "Mr. Comoletti threatened and intimidated Humphrey to give up his constitutional right to seek judicial redress for a breach of contract." [ECF No. 48 at 5].

MCRA liability arises when "(1) the defendant threatens, intimidates, or coerces the plaintiff, in order to (2) cause the plaintiff to give up something that the plaintiff has the constitutional right to do." Goddard v. Kelley, 629 F. Supp. 2d 115, 128 (D. Mass. 2009).

---

[4] Alternatively, the Court also finds that Plaintiffs have alleged additional conduct that forms a separate basis, apart from the petitioning activity, for their abuse of process claim. Here, the conduct complained of is not only Comoletti's report to the police, but also his threat, directed at Stephens and Humphrey, that he knew Fall River Police officers personally, that he would have them go to Stephens' residence in order to coerce them, and that they ultimately did do that. Such conduct is not protected by the Anti-SLAPP statute. See Jobs First Indep. Expenditure Political Action Comm. v. Coakley, No. 14-14338-NMG, 2016 WL 6661142, at *3 (D. Mass. Nov. 10, 2016) (denying special motion to dismiss because claim was also based, in addition to criminal complaint, on "press conference and press release," which are not protected petitioning activity); see also Cadle Co. v. Schlichtmann, 859 N.E.2d 858, 867 (Mass. 2007) (holding that public statements made by lawyer about ongoing litigation "in hopes of shoring up his or her own position" are not protected petitioning activity and finding that defendants failed to make requisite threshold showing as a result). Although reporting criminal activity is protected petitioning activity, Benoit v. Frederickson, 908 N.E.2d 714, 718 (Mass. 2009), coercive threats that rely on police authority are not, see Mass. Gen. Laws ch. 231, § 59H.

Plaintiffs argue in their opposition brief that they have a constitutional right to redress a breach of contract. There are no allegations in the Amended Complaint, however, that Comoletti threatened Humphrey in order to interfere with any such right. In fact, the Amended Complaint never alleges the existence of any contract or the breach of a contract, and the allegations provide no indication that the basis of Comoletti's MCRA liability depends on the Plaintiffs' right to judicial redress of a breach of contract. Moreover, Count VII purports to assert a claim pursuant to Article 14 of the Massachusetts Declaration of Rights, which provides for the "right to be secure from all unreasonable searches, and seizures." Mass. Const. Pt. 1, art. XIV. Accordingly, Count VII is dismissed.

## VI.    CABRAL'S AND FALANDYS' MOTION TO DISMISS

Cabral and Falandys argue that each of the three counts alleged against them (Counts I, II, and V) should be dismissed.

### a.  Count I: the § 1983 claim

Pursuant to 42 U.S.C. § 1983, Plaintiffs argue three theories under which Falandys and Cabral might be liable for a constitutional violation in connection with the execution of the search warrant: that they personally kicked Humphrey, that they failed to intervene as another officer kicked him, and/or that they failed to provide him with necessary medical care. Falandys and Cabral argue that the § 1983 claim must be dismissed because Plaintiffs fail to allege sufficient facts with respect to Falandys and Cabral that would make the claim plausible under any theory.

Each theory relies on a different standard. "[A]n 'excessive force' claim that arises in the context of a search or seizure is 'properly analyzed under the Fourth Amendment's objective reasonableness standard.'" Aponte Matos v. Toledo Davila, 135 F.3d 182, 191 (1st Cir. 1998)

(quoting Graham v. Connor, 490 U.S. 386, 388 (1989) (further internal quotations omitted)).

"[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts

and circumstances confronting them, without regard to their underlying intent or motivation."

Graham, 490 U.S. at 397. "[M]ere presence at the scene, without more, does not by some

mysterious alchemy render [a police officer] legally responsible under section 1983 for the

actions of a fellow officer." Calvi v. Knox Cty., 470 F.3d 422, 428 (1st Cir. 2006). A police

officer, however, may be liable for a constitutional violation under § 1983 in connection with the

use of excessive force if he failed to intervene, which requires showing that the defendant "1)

was present when excessive force was used, 2) observed the use of excessive force, 3) was in a

position to realistically prevent that force and 4) had sufficient time to do so." Walker v. Jackson,

56 F. Supp. 3d 89, 96 (D. Mass. 2014) (citing Davis v. Rennie, 264 F.3d 86, 102 (1st Cir. 2001)).

Finally, "[a] police officer who fails to provide adequate medical treatment to an individual

injured during apprehension violates the Fourteenth Amendment if such inattention constitutes

deliberate indifference to serious medical needs." Turkowitz v. Town of Provincetown, 914 F.

Supp. 2d 62, 71 (D. Mass. 2012) (citing Brace v. Massachusetts, 673 F. Supp. 2d 36, 40 (D.

Mass. 2009)). To make out this claim, "a plaintiff must establish that the officer was aware of a

substantial risk of serious harm which he intentionally disregarded." Id. In a § 1983 case,

vicarious liability is not available and "a plaintiff must plead that each Government-official

defendant, through the official's own individual actions, has violated the Constitution." Iqbal,

556 U.S. at 676.

With respect to Falandys, Plaintiffs assert that he applied for and received the search

warrant from a judge and accompanied numerous officers, including Cabral and seven John

Does, to Stephens' residence to execute the search warrant. They further claim that at least one

14

of the Officer Defendants, including possibly Falandys or Cabral, kicked Humphrey in the head and back and that the officers failed to intervene during the alleged assault or to provide Humphrey with medical aid afterwards. When Humphrey regained consciousness and asked why he had been kicked, an unknown officer responded "some people deserved to be kicked."

Plaintiffs plead a plausible § 1983 claim against Falandys and Cabral, and each of the John Does, for use of excessive force. Defendants do not argue that the assault on Humphrey was warranted. Plaintiffs allege that Falandys and Cabral were part of the group that executed the search warrant in the apartment, which led to the assault. They specifically state that, in the process of the search, all of the Officer Defendants were present and at least one, and perhaps more, of the Officer Defendants kicked Humphrey. This allegation allows the Court to reasonably infer that Cabral and Falandys could have been the officer who kicked him. Because Plaintiffs have sufficiently alleged that Falandys and Cabral were each directly involved in the allegedly unconstitutional beating, a § 1983 claim against them based on excessive force survives a motion to dismiss. See Sanchez v. Pereira-Castillo, 590 F.3d 31, 50–51 (1st Cir. 2009) (holding that § 1983 claim survives motion to dismiss against specific defendants where plaintiff alleged that the defendant was a "primary violator").

The Court appreciates the difficulty of uncovering the identity of the officer(s) that may have been involved in the incident described in the Amended Complaint and the § 1983 claim may proceed as against the unknown officers, as well as Falandys and Cabral. "[A] plaintiff may bring suit against a fictitious or unnamed party where a good-faith investigation has failed to reveal the identity of the relevant defendant and there is a reasonable likelihood that discovery will provide that information." Martinez-Rivera v. Sanchez Ramos, 498 F.3d 3, 8 (1st Cir. 2007).

"[O]nce those identities are revealed, the plaintiff should act promptly to amend the complaint to substitute the correct parties and to dismiss any baseless claims." Id. at 8 n.5.

### b. Count II: the § 1985(3) claim

Plaintiffs also allege pursuant to 42 U.S.C. § 1985(3) that the Officer Defendants conspired to use excessive force against Humphrey because he was African-American. Section 1985 "confers a private right of action for injuries occasioned when 'two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.'" Burns v. St. Police Ass'n of Mass., 230 F.3d 8, 12 n.3 (1st Cir. 2000) (quoting 42 U.S.C. § 1985(3)). To successfully plead a § 1985(3) claim, "[f]irst, the plaintiff must allege a conspiracy; second, he must allege a conspiratorial purpose to deprive the plaintiff of the equal protection of the laws; third, he must identify an overt act in furtherance of the conspiracy; and finally, he must show either injury to person or property, or a deprivation of a constitutionally protected right." Perez-Sanchez v. Pub. Bldg. Auth., 531 F.3d 104, 107 (1st Cir. 2008) (citing Aulson v. Blanchard, 83 F.3d 1, 3 (lst Cir. 1996)).[5] With respect to the "equal protection" element, a plaintiff must "allege the existence of a conspiracy intended to deprive an individual or class of persons of protected rights based on 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus.'" Burns, 230 F.3d at 12 (quoting Aulson, 83 F.3d at 3).

Plaintiffs fail to sufficiently plead that there was a conspiracy to use excessive force against Humphrey that aimed to deprive him of the equal protection of the laws and that Falandys and Cabral undertook an overt act in furtherance of that conspiracy. Although courts

---

[5] Although unclear in the Amended Complaint, Plaintiffs' opposition to Falandys' and Cabral's motion to dismiss clarifies that they specifically allege a § 1985(3) claim.

have acknowledged that the "agreement" element of a conspiracy claim "is seldom susceptible of direct proof," and that "more often than not such an agreement must be inferred from all the circumstances," Earle v. Benoit, 850 F.2d 836, 843 (1st Cir. 1988), Plaintiffs must still allege "enough factual matter (taken as true) to suggest that an agreement was made," Twombly, 550 U.S. at 556. Here, apart from Plaintiffs' bare assertion that there was a conspiracy, nothing in the Amended Complaint plausibly suggests that any of the defendants agreed—either tacitly or expressly—to use excessive force against Humphrey because he was African-American. Generously construing the Amended Complaint in Plaintiffs' favor, the allegations that Comoletti threatened to call the police and that the police ultimately did show up is not enough to support an inference that the Officer Defendants entered into some sort of civil rights conspiracy. See Twombly, 550 U.S. at 556 (holding that allegations must "plausibly suggest[] (not merely [be] consistent with) agreement"). Accordingly, the § 1985(3) claim (Count II) is dismissed.

### c.   Count V: the MCRA and Article 14 of the Massachusetts Declaration of Rights

In Count V, Plaintiffs allege that the Officer Defendants, including Falandys and Cabral, deprived Humphrey, by the use of threats, intimidation, and coercion, of his civil rights under both Article 14 of the Massachusetts Declaration of Civil Rights ("Article 14") and the MCRA, Mass. Gen. Laws ch. 12, § 11I. Falandys and Cabral argue that the count should be dismissed because a violation of the MCRA requires more than a constitutional violation and Plaintiffs cannot bring a discrete claim under Article 14.

The MCRA provides a cause of action for the (1) interference of a plaintiff's exercise or enjoyment of federal or state rights (2) by "threats, intimidation, or coercion." See Mass. Gen. Laws ch. 12, § 11I. Although the MCRA is entitled to a liberal construction, the Massachusetts

Supreme Judicial Court has specifically cautioned that it was "not intended to create a 'vast constitutional tort,' . . . and that the remedies under the act were 'explicitly limited' to those situations 'where the derogation of secured rights occurs by threats, intimidation or coercion.'" Haufler v. Zotos, 845 N.E.2d 322, 335 (Mass. 2006) (quoting Bally v. Ne. Univ., 532 N.E.2d 49, 52 (Mass. 1989)). Thus, "[t]he direct violation of a constitutional right does not establish a MCRA violation because 'it is not an attempt to force someone to do something the person is not lawfully required to do.'" Stone v. Caswell, 963 F. Supp. 2d 32, 37 (D. Mass. 2013) (quoting Columbus v. Biggio, 76 F.Supp.2d 43, 54 (D. Mass. 1999)); see also Longval v. Comm'r of Corr., 535 N.E.2d 588, 593 (1989) ("A direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the Act." (citing Pheasant Ridge Assocs. Ltd. P'ship v. Burlington, 506 N.E.2d 1152, 1159 (Mass. 1987)).

"'Threat' in this context involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." Planned Parenthood League of Mass., Inc. v. Blake, 631 N.E.2d 985, 990 (Mass. 1994). "'Intimidation' involves putting in fear for the purpose of compelling or deterring conduct." Id. "Coercion" is "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." Id. (quoting Webster's New International Dictionary at 519 (2d ed. 1959)). The standard for determining whether the conduct at issue qualifies as a threat, intimidation, or coercion is an objective one. Id.

Here, Plaintiffs allege that Humphrey was ordered to lie down when the police executed the search warrant and prior to kicking him. "[N]ormally lawful restraint may constitute coercion under the MCRA if the causation requirement is met—in other words, if such restraint is applied in order to cause the plaintiff to give up his constitutional rights." Spencer v. Roche, 755 F.

Supp. 2d 250, 267 (D. Mass. 2010) (collecting cases). Plaintiffs, however, have failed to put

forth sufficient facts to allow the Court to infer that this causation requirement could be met here.

Plaintiffs claim that Humphrey was told to lie down and that he was kicked, but they do not

allege that he was told to lie down so that they could deprive him of a constitutional right.

Accordingly, Count V (MCRA claim) is dismissed.[6]

### d.  Loss of consortium claims

In each count, Plaintiffs allege that Humphrey's daughters, also parties to this suit,

suffered a loss of consortium with their father as a result of his injuries. Falandys and Cabral

argue for the dismissal of Plaintiffs' loss of consortium claims based on three grounds: that

Plaintiffs cannot claim loss of consortium based on violations of the MCRA and § 1983, that the

viability of such claims depends on the viability of the principal claims, and that Plaintiffs have

failed to make out the basic elements of such a claim. Plaintiffs make no argument in opposition.

A viable loss of consortium claim requires some sort of dependence of the child on the parent. "It

is sufficient if the child is living in the injured parent's household and is dependent on the parent

for management of the child's needs and for emotional guidance and support." Glicklich v.

---

[6] Whether a claim can be brought directly under the Massachusetts Declaration of Rights or whether it must be brought pursuant to the MCRA is an "open question." See Tomaselli v. Beaulieu, 967 F. Supp. 2d 423, 448 (D. Mass. 2013), aff'd, No. 13-2218 (1st Cir. Dec. 16, 2014). The SJC has noted, however, that "a State may not violate a person's constitutional rights and then fairly assert that no redress can be had because the State has not provided a statutory means of enforcing those rights." Layne v. Superintendent, Mass. Corr. Inst., Cedar Junction, 546 N.E.2d 166, 169 (Mass. 1989); see also Merisier v. Ellender, 197 F. Supp. 3d 310, 323 (D. Mass. 2016); Parsons ex rel. Parsons v. Town of Tewksbury, No. 091595, 2010 WL 1544470, at *5 (Mass. Super. Ct. Jan. 19, 2010) ( holding that "as a general proposition, a cause of action can, in certain circumstances, be brought directly under the Massachusetts Declaration of Rights in the absence of a statutory vehicle for obtaining relief."). Plaintiffs only seek to pursue a direct constitutional claim in the alternative. See [ECF No. 53 at 15]. Here, the MCRA is available as a statutory vehicle to vindicate the Plaintiffs' constitutional rights even if Plaintiffs have failed to adequately plead the MCRA's two requirements at this time.

Spievack, 452 N.E.2d 287, 292 (Mass. App. Ct. 1983). The Amended Complaint contains no allegations regarding Taneisha Humphrey and J.B.'s dependence on Humphrey. Additionally, "[r]elatives of a federal civil rights victim are not permitted to raise a claim for loss of consortium based upon the federal civil rights violation under § 1983." Kennedy v. Town of Billerica, 502 F. Supp. 2d 150, 160 (D. Mass. 2007) (citing Tauriac v. Polaroid Corp., 716 F. Supp. 672, 673 (D. Mass 1989)). "Similarly, it does not appear as if the plaintiffs can state a claim for loss of consortium for violations of [the MCRA]." Id. Accordingly, the loss of consortium claims in Counts I, II, and V are dismissed.

## VII.   CITY OF FALL RIVER'S MOTION TO DISMISS

The City of Fall River argues that the counts alleged against it (Counts III and IV) should be dismissed.

### a.   Count III: the § 1983 Monell claim

In Count III, Plaintiffs allege that the City of Fall River is liable under § 1983 because it developed and maintained customs, policies, and/or practices that exhibited deliberate indifference to the constitutional rights of its citizens and caused Humphrey's injuries. The City argues that the count must be dismissed because it is insufficiently pleaded.

A municipality can be liable for a constitutional violation under § 1983 "only if the violation occurs pursuant to an official policy or custom," Welch v. Ciampa, 542 F.3d 927, 941 (1st Cir. 2008), "whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). Executing the "policy or custom" must be the "'moving force' behind that constitutional violation." Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 25 (1st Cir. 2005) (quoting Monell, 436 U.S. at 694). "Further, the Supreme Court has imposed two additional

requirements: 1) that the municipal policy or custom actually have caused the plaintiff's injury, and 2) that the municipality possessed the requisite level of fault, which is generally labeled in these sorts of cases as 'deliberate indifference.'" Young, 404 F.3d at 26.

"Deliberate indifference cannot be inferred; it must be shown in the complaint." Santiago v. Bloise, 741 F. Supp. 2d 357, 362 (D. Mass. 2010). It "will be found only if it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights." Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008) (quoting Hegarty v. Somerset Cty., 53 F.3d 1367, 1380 (1st Cir. 1995)). "[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." Connick v. Thompson, 563 U.S. 51, 61 (2011) (citing Bd. of the Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 407 (1997)). With respect to liability based on hiring, "[i]t is much harder for a Monell plaintiff to succeed on a hiring claim than a failure to train claim." Young, 404 F.3d at 30.

In addition to the incident involving Humphrey, Plaintiffs allege one other incident in 2011 involving the use of excessive force when Fall River Police executed a search warrant, which resulted in a citizen's death.[7] They allege that Fall River Police, including the Officer Defendants, "have previously assaulted citizens without just cause," Compl. ¶ 47, and "[t]here is a history of violence by the Fall River Police against minorities," Id. ¶ 48. They further claim the officers' actions that resulted in Humphrey's injuries "were done pursuant to policy, practice and

---

[7] Plaintiffs also include a 2016 news article in their opposition to the motion to dismiss that they ask the Court to take judicial notice of and which they offer as a third incident that evidences the Fall River Police Department's use of excessive force. The Court takes judicial notice of the existence of the news article without regard to the truth of its contents. See U.S. ex rel. Winkelman, 118 F. Supp. 3d at 422 n.6.

action of the City of Fall River and the Fall River Police Department when executing the search warrant." Id. ¶ 52. Specifically, they allege that the City was aware of past incidents, failed to properly train officers to avoid such incidents, failed to adequately supervise them in carrying out their duties, provided grossly inadequate discipline and remediation to officers, and exhibited deliberate indifference "in hiring officers who demonstrate a propensity towards abuse of authority and violence," id. ¶ 75.

At the motion to dismiss stage, Plaintiffs have alleged sufficient facts to allow the § 1983 Monell claim to go forward as against the City. They have alleged the existence of a policy or custom—failure to adequately train, supervise, and discipline, and hiring officers with a propensity towards violence—that caused Humphrey to be injured by Fall River Police Officers. See Luthy v. Proulx, 464 F. Supp. 2d 69, 74 (D. Mass. 2006). "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by [Supreme Court precedent]—can a city be liable for such a failure under § 1983." City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989). Plaintiffs have shown two incidents, within a five-year period, that each involved the possible use of excessive force by the Fall River Police, and which resulted in death, and they have alleged, upon information and belief, that the officers were not trained following these incidents. Notably, these two incidents involved the same officer, Falandys, which supports Plaintiffs' suggestion that there may be a policy of improper discipline, training, or supervision. Moreover, Plaintiffs have indicated, by a newspaper article that this Court took judicial notice of, that there may be additional incidents. These facts very thinly but plausibly suggest the City's deliberate indifference to the fact that their policies or customs may lead to constitutional violations.

### b.  Count IV: Vicarious Liability

In Count IV, Plaintiffs allege that because the Officer Defendants "were acting within the course and scope of their employment and agency" during the alleged acts of excessive force, the City is vicariously liable for their actions. A municipality, however, may not be liable under § 1983 based on a vicarious liability theory. See Monell, 436 U.S. at 691 ("A municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."); Freeman v. Town of Hudson, 714 F.3d 29, 37 (1st Cir. 2013); Marrero-Rodriguez v. Municipality of San Juan, 677 F.3d 497, 503 (1st Cir. 2012) ("Nor may the Municipality be sued under § 1983, as pled, on a *respondeat superior* theory that it is liable because it employs the individual defendants."). Furthermore, Plaintiffs failed to oppose the City's motion to dismiss Count IV. Accordingly, Count IV is dismissed.

### c.  Loss of consortium claims

The City of Fall River also argues that Humphrey's children cannot claim a loss of consortium in connection with the counts alleged against them. For the same reasons discussed above in dismissing the loss of consortium claims in Counts I, II, and V, the loss of consortium claims in Count III and IV are also dismissed.

### d.  Taneisha Humphrey and J.B.'s standing

The City of Fall River argues that Taneisha Humphrey and J.B. do not have standing to pursue claims for their father's injuries under § 1983. The standing determination is "claim-specific," meaning that a plaintiff "must have standing to bring each and every claim that she asserts." Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012). To have standing, a plaintiff "must not only allege injurious conduct attributable to the defendant but also must allege that

[she, herself,] is among the persons injured by that conduct." <u>Hochendoner v. Genzyme Corp.</u>, 823 F.3d 724, 731–32 (1st Cir. 2016). Having already addressed their loss of consortium claims, there is no injury-in-fact that would give Taneisha Humphrey and J.B. standing to remain in this suit. Plaintiffs have not argued to the contrary.

## VIII.   CONCLUSION

For the foregoing reasons, Comoletti's motion to dismiss [ECF No. 40] is <u>GRANTED</u> with respect to Count VII (MCRA), but <u>DENIED</u> with respect to Count VI (abuse of process). Falandys' and Cabral's motion to dismiss [ECF No. 42] is <u>GRANTED</u> as to Counts II (§ 1985(3)) and V (MCRA), but <u>DENIED</u> as to Count I (§ 1983). Count I, except with respect to the loss of consortium claims, also proceeds as against the John Doe Defendants.[8] The City of Fall River's motion to dismiss [ECF No. 45] is <u>GRANTED</u> as to Count IV (vicarious liability), but <u>DENIED</u> as to Count III (§ 1983 <u>Monell</u> claim). Counts II, IV, V, and VII are hereby <u>DISMISSED</u>. Further, the loss of consortium claims alleged in all counts are also <u>DISMISSED</u>. Finally, the Court concludes that Taneisha Humphrey and J.B. do not have standing to remain in this suit and their claims are hereby dismissed.

**So Ordered.**

Dated: March 31, 2017

/s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE

---

[8] Because the reasons for dismissing Count II (§ 1985(3)) and Count V (MCRA) are generally applicable to all Officer Defendants they are asserted against, the Court also dismisses Counts II and V as against the John Doe Defendants.